## Case No. 4,818.

FISHER et al. v. CURRIER et al.

[5 Law Rep. 217; 1 Pa. Law J. 270.]

District Court, D. Massachusetts. June, 1842.

William Gray, for petitioners.
Benjamin R. Curtis, for respondents.

SPRAGUE, District Judge. This is a petition to have Currier and Smith declared bankrupts. It is resisted on the ground that they have committed no act of bankruptcy. One act relied upon by the petitioners is an attachment, or rather attachments, of all the stock in trade of the respondents, made on the 19th of March last, on two writs, one in favor of Benjamin Smith, the father; and the other in favor of Benjamin Smith, Junior, the brother of Hambleton E. Smith, one of the respondents. There is some discrepancy in the testimony; but I think the following facts are proved. Currier and Smith are now, and were, on the 19th of March, insolvent. They had been previously pressed for means to meet their engagements, and Currier had gone to Maine for the purpose of collecting debts. During his absence, the pressure upon the firm increased, and it is testified by Wells, their clerk, that they appeared to be in embarrassed circumstances. The appearances of embarrassment were such as to attract the attention of Mr. Frothingham, who was, or assumed to be the agent of Benjamin Smith, who was absent at his home in Duxbury. Frothingham asked Smith, the respondent, what was the matter. He said they were "terribly short." A conversation ensued, in which Frothingham asked him if Currier and Smith did not still owe his father and brother; to which he answered in the affirmative, and Frothingham told him he should cause attachments to be made immediately in their favor; to which Smith made objection, but handed him one of the three notes on which the attachments were made, and copies of the two others which Frothingham immediately carried to Mr. Curtis, and procured two writs upon which the attachments were immediately made. Frothingham had no other authority to make these attachments, than "a general authority, given by Benjamin Smith a year or two before, to keep an eye to his interests here." Mr. Curtis instructed Frothingham, that the actions might be maintained if the plaintiffs should ratify them before any other attachment should be laid, and advised him to send to Duxbury immediately to obtain their ratification. This was after two o'clock. On the same day, Smith, the respondent, wrote to his father to come to Boston and "take care of himself, or secure himself:" and the father came the next morning and ratified the proceedings of Frothingham. Frothingham did not write or send to the father. Benjamin Smith, Junior, was absent at sea, and has not returned, nor been informed of the suit commenced in his behalf. Currier returned from Maine on the 20th of March. The actions were entered at the April term of the common pleas in Suffolk. Currier and Smith employed an attorney, who entered on adverse appearance; but a default was entered about the first of May, and judgment on the seventh of that month. Neither of the respondents have petitioned for the benefit of the bankrupt law, and both resist this application.

The first section of the statute [of 1841 (5 Stat. 440)] makes it an act of bankruptcy for a debtor to "willingly or fraudulently procure his goods and chattels to be attached." If a debtor voluntarily aid his creditor in taking his goods and chattels upon a writ by way of attachment, or in perfecting at attachment previously incomplete, he must be deemed to have willingly procured his goods and chattels to be attached, within the meaning of the statute.

There are two things done by Hambleton E. Smith, of very grave import; First, the de-

livery of the note and copies of notes to Frothingham; and second, writing to his father to come and secure himself.

The first is proved by Frothingham, who is a witness for the respondents, and who alone knows the attending circumstances. His testimony therefore, is very material. He says that appearances were such as to excite his suspicions, and on the 17th of March, he asked Hambleton E. Smith what was the matter. And he replied, they were terribly short; and in answer to another question, he said, that they still owed his father and brother;—and upon further inquiry as to ways and means,—Frothingham was so convinced of their great embarrassment that he told Hambleton E. Smith that he should make attachments for the father and brother before he went to dinner. Hambleton E. Smith said, "Oh no, we 'can borrow; we can get along;" that it would be the breaking of them up, and would ruin them, and they could borrow. Further conversation ensued, in which Frothingham again said he should put an officer into the store, and Hambleton E. Smith objected and protested. Frothingham told him, if he would show him any thing to alter his opinion he would alter it. Smith did not; but delivered to Frothingham the note and copies of notes, which he wanted for the sole and avowed purpose of making attachments, and which he carried immediately to Mr. Curtis, and caused the writs to be made. At what point of time the note and copies were delivered, and what was then said we are not distinctly informed, for, in the first deposition given by Mr. Frothingham, which purports, in answer to the 12th interrogatory, to state all that was said and done between him and Smith, no mention is made of this most material fact, —and, in answer to the third cross-interrogatory, he testified, that he had stated fully all that passed between him and Hambleton E. Smith. It was not until his second deposition was taken, and the question was pointedly put to him, whether Hambleton E. Smith handed him copies of notes, that the fact was disclosed by him. And it further appears, that Frothingham learned from Hambleton E. Smith the amounts of the debts due to the father and brother, and that Hambleton E. Smith had no knowledge that Frothingham had any agency or authority whatever from the father.

In answer to a question by the respondent's counsel, whether H. E. Smith gave the note and copies willingly; he replied "Not very willingly;" and to a cross-interrogatory, he said, that the reason he said so, was, that Smith was not willing he should take the step he did; and refers to his former depositions for the facts on which he made that statement. Now, considering the position which Mr. Frothingham occupies, as the son-in-law of Benjamin Smith, the father, and one who has voluntarily commenced process for securing to him and his brother-in-law

a priority, and having a natural anxiety to accomplish that purpose; and considering that he omitted in his first deposition to state the fact of his receiving the note and copies; and considering also, the testimony of Baker as to his declarations, touching the letter written by Smith to his father, and Frothingham's naked denial of such declarations, and his denial of knowledge who wrote the letter to the father coupled with the fact, that Mr. Curtis advised him to send to the father immediately, and that he did not, but Smith, the son, did,—we are irresistibly led to the conclusion, that his wishes are strongly on the side of the respondents, and that, while he has testified truly, in answer to direct and specific inquiries, he has been reserved as to matters adverse to the respondents, and not drawn out by pointed interrogatories.

Now, from the whole testimony in the case, I think it is fairly to be inferred, that, whatever may have been the reluctance of H. E. Smith, in the first instance, to accede to the views of Frothingham in having an attachment made, yet that in the end and before Frothingham left him, he was so convinced or persuaded as to accede to those views, and voluntarily to lend his aid to carry them into effect. And for that purpose, he delivered him the note and copies, and wrote to his father to come and secure himself. His conduct since has been in perfect accordance with this view, and calculated to secure the priority of his father and brother. It is true that the respondent employed counsel to appear in the actions, but for what purpose is left to inference. The debts were not disputed. There could then have been no object but delay; and what benefit could have been anticipated from that is not explained. One of the actions, that in favor of B. Smith, Jr., was commenced and prosecuted without the semblance of authority, and Frothingham testified, that H. E. Smith had no reason to believe that he had authority; yet the plaintiff's appearance was never called for, and no objection interposed to the suit proceeding to judgment without the plaintiff ever having authorized its commencement or having knowledge of its pendency. Before the ratification of the father, his attachment was incomplete. That ratification was procured immediately by the active interference of the respondent Smith. I am constrained, therefore, after a careful consideration of the evidence, to come to the conclusion, that the aid given by H. E. Smith, in commencing and perfecting the attachments, was an act of bankruptcy within the meaning of the statute. But Currier was absent and had no knowledge of these proceedings, or of the attachments until his return on the 20th of March; and it is contended, that he cannot be affected thereby, nor his (separate or joint) property taken without his personal agency or default. Such is not necessarily the law of partnerships; and, in order to see

whether it be so under our bankrupt system, we must recur to the statute. The fourteenth section is peculiar, and could not, I think, have constituted a part of the bill as originally framed, or been prepared by the same hand. Its language is dissimilar, and it refers to an order as being provided by the act which is not in terms found therein. I have had much difficulty in satisfying my own mind as to its true construction in some particulars. But, without undertaking to determine what may be the effect of a mere insolvency of a partnership, I think it is clear, that when the partners of a firm are insolvent and there is sufficient ground, either upon a voluntary or adverse petition, for a decree of bankruptcy against any member of the firm, it is the intention of the statute that all the joint stock and property of the company, and also all the separate estate of each of the partners shall be taken. Indeed, the language of the fourteenth section is in this respect clear and explicit. But if it were less so, still in a case like the present, where the decree of bankruptcy is to pass because of attachments of the property of the company, it would seem that such property ought to be taken by the assignee, otherwise these very attachments may remain in force, and the purpose of the law, in pronouncing them an act of bankruptcy, be defeated. The object to be accomplished, being thus settled by the statute, the only question that remains, is the manner in which it is to be attained, that is, the form of the decree. Shall it be against both the members of the firm as bankrupts, or against Smith only as a bankrupt, and pronouncing the firm to be insolvent, and thereupon all the joint and separate property to be taken by the assignee? The statute is in this respect by no means clear. But as one at least of the prerequisites of the decree is the insolvency of both partners; and the order, which is required in the fourteenth section to be "made in the manner provided in the act," must, I think, refer to the decree or declaration of bankruptcy prescribed in the first section; and, as the fourth section provides for a discharge of those only, who have been declared bankrupts, and by the fourteenth section the certificate of discharge is to be "granted or refused to each partner as the same would or ought to be if the proceedings had been against him alone;" and as uniformity in the proceedings will be thus best preserved, I am of opinion that there should be in this case a decree or declaration of bankruptcy against both the respondents. This precludes the necessity of examining the other questions which have been discussed at the bar.

The following decree was thereupon entered: "Order and decree. And now it appearing to the court here, that due notice has been given to all parties and persons in interest pursuant to the order of court, and that, on the seventeenth day of March, in the year one thousand eight hundred and forty-two, the said Currier and Smith were merchants and partners in trade, and that they were then and still are owing debts to the amount of not less than two thousand dollars, and that they did then and do still owe, to the petitioners, debts, amounting in the whole to not less than five hundred dollars, and that they were then and still are insolvent, and that the said Smith did, on said seventeenth day of March, willingly procure the goods and chattels of the said partners to be attached; it is ordered and decreed by the court that the said Gilman Currier and the said Hambleton E. Smith be and they are hereby declared and decreed to be bankrupts pursuant to the act of congress, entitled 'An act to establish a uniform system of bankruptcy throughout the United States,' passed August 19, 1841."

At a subsequent day the respondents demanded a trial by jury.